DOMINGO PIOVANETTI ANTONSANTI y sus hijos TERESA, ANTONIO, ENRIQUE, NÉSTOR, CÉSAR Y DOMINGO PIOVANETTI DUMONT, demandantes y apelantes, *v.* ANTONIO VIVALDI PACHECO, demandado y apelado.

Número 11594.

*Sometido:* 11 de junio de 1956. *Resuelto:* 28 de junio de 1957.

*Guillermo S. Pierluisi,* abogado de los apelantes; *Oscar Souffront,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR SALDAÑA emitió la opinión del tribunal.

El demandante Domingo Piovanetti y su esposa constituyeron hipoteca voluntaria sobre una finca, por escritura que se otorgó el 20 de enero de 1925, para garantizar al demandado Vivaldi el pago de la suma de $2,100 de capital de un

préstamo con intereses al 12% anual y $250 para costas, gastos y honorarios de abogado en caso de reclamación judicial. La finca hipotecaria pertenecía a la sociedad de gananciales de los esposos deudores. Éstos se obligaron a pagar el capital en tres plazos, el último de los cuales vencía el día 1 de enero de 1928. Además, respecto a los intereses se dispuso lo siguiente: "el interés que media en este contrato es el de 12% anual, que los esposos deudores se comprometen a pagar al acreedor Don Antonio Vivaldi y Pacheco, por anualidades vencidas." Dicha hipoteca fué debidamente inscrita en el Registro de la Propiedad. Posteriormente, incumplida la obligación de pago, el acreedor hipotecario (aquí demandado) entabló procedimiento ejecutivo sumario para hacer efectivos los créditos garantizados. En el escrito inicial, que radicó el 21 de febrero de 1929, consignó el siguiente cómputo:

| | |
|---|---|
| Capital de la deuda..................... | $2100.00 |
| Intereses al 12% hasta enero 29 de 1929... | 1008.00 |
| | $3108.00 |
| Abonado a cuenta de intereses.......... | 500.00 |
| Diferencia | $2608.00 |
| Consignado para gastos, costas y honorarios de ejecución.................... | 250.00 |
| Gran Total | $2858.00 |

También reclamó el acreedor en dicho escrito inicial "los intereses sobre $2,100 desde enero 29/29 al 12% anual hasta el total solvendo de la deuda".

Habiendo cumplido el acreedor ejecutante con los demás requisitos del procedimiento sumario, el márshal de la corte requirió de pago al deudor Domingo Piovanetti, el 11 de marzo de 1929, y, transcurridos 30 días desde esa fecha sin que el deudor efectuase el pago, a instancia del acreedor se procedió a ordenar el día 6 de julio de 1929 la venta en pública subasta de la finca hipotecada. La ejecución se pro-

siguió de acuerdo con los trámites que fija la ley. Finalmente, la finca fué adjudicada al acreedor por la suma de $250 en abono de su reclamación y se otorgó la correspondiente escritura de venta judicial de la finca que figura aún inscrita en el Registro a nombre de Vivaldi Pacheco.

En 1953 el deudor Piovanetti y los herederos de su esposa instaron la presente acción de reivindicación y cobro de frutos, fundándose en la nulidad del referido procedimiento sumario de ejecución hipotecaria. En su demanda y en el juicio ante el Tribunal Superior adujeron como motivos de nulidad: *primero*, que se cobró más de la cantidad adeudada por principal e intereses de la deuda hipotecaria ya que cierto abono de $500 hecho al acreedor en 1925 redujo el capital a la suma de $1831; y *segundo*, que no se requirió de pago por el márshal de la corte a la esposa del deudor hipotecario.

Visto el caso, el tribunal a quo declaró sin lugar la demanda. Como cuestión de hecho determinó que el abono de $500 fué efectuado en el año 1928; que para dicha fecha se adeudaba más de esa cantidad por concepto de intereses vencidos sobre la deuda principal; y que la referida suma fué efectivamente abonada a tales intereses vencidos, según se hizo constar en el escrito inicial del procedimiento de ejecución.[1] Además resolvió que, tratándose de bienes gananciales, el requerimiento de pago que hizo el márshal de la corte al marido era suficiente. Por tanto, determinó que "el acreedor y ahora demandado reclamó en el procedimiento ejecutivo únicamente las cantidades que real y efectivamente le eran adeudadas por el capital, intereses y costas y honorarios del crédito hipotecario" y que dicho procedimiento sumario "fué válido en toda su tramitación y válida y legal la adjudicación de la finca ... al acreedor hipotecario."[2]

[1] La contención de los demandantes era que el abono de $500 se hizo en 1925, reduciendo el capital del préstamo hipotecario a la suma de $1831, y que, por tanto, debieron acreditarse a intereses vencidos la suma de $231 y los restantes $269 al capital adeudado.

[2] Habiendo llegado a las anteriores conclusiones, el Tribunal Superior no hizo pronunciamiento alguno respecto a la reconvención que presentó el demandado en este caso.

■ En este recurso de apelación interpuesto por los demandantes, se señala en primer lugar que el procedimiento ejecutivo es nulo porque la esposa del deudor no fué requerida de pago personalmente por el márshal de la corte. En verdad este señalamiento no merece seria consideración. La esposa no es parte necesaria en un pleito en que se trata de cobrar una deuda garantizada con bienes inmuebles de la sociedad de gananciales y, por tanto, la jurisprudencia tiene establecido que dentro del procedimiento hipotecario basta el requerimiento de pago que se hace al marido como representante legal de la misma. *Porto Rican Leaf Tobacco Co.* v. *Ereño*, 16 D.P.R. 100 (1910) y *Torres* v. *Lothrop, Luce & Co.*, 16 D.P.R. 180, 185 (1910). Véase además Muñoz Morales, Lecciones de Derecho Hipotecario, Tomo II, págs. 195 y 210.

■■ En segundo lugar, apuntan los demandantes en su recurso que el procedimiento ejecutivo sumario llevado a cabo por el demandado es nulo, pues no podían cobrarse en el mismo intereses al tipo de 12% desde la fecha del vencimiento hasta el pago final de la deuda, como lo hizo el acreedor, de acuerdo con el escrito inicial que consta en autos. Aunque el apelado admite que ni en el contrato de préstamo ni en la hipoteca se hizo expresión alguna con respecto a intereses posteriores al vencimiento del plazo contractual o a intereses en caso de mora, no obstante alega que procedía el cobro dentro del ejecutivo sumario de intereses al 12% anual sobre el capital del préstamo "tanto hasta el vencimiento como en caso de mora ... por ser el único tipo de interés que mediaba en dicho contrato de hipoteca". Además arguye que la causa de nulidad a que se refiere este segundo señalamiento de error nunca se planteó específicamente ante el Tribunal Superior y que, por tanto, constituye una cuestión nueva que no puede suscitarse en apelación.

Debemos señalar ante todo, como punto de partida imprescindible del análisis de las cuestiones planteadas, que en la escritura de hipoteca sólo se estipularon intereses a pagar

sobre el capital del préstamo *durante el término del contrato.* No hubo pacto alguno relativo a intereses después del vencimiento del débito. Tampoco se pactaron intereses por concepto de mora. Este hecho surge claramente de la única estipulación respecto a intereses que contiene el contrato de préstamo incorporado en la escritura de hipoteca: "El interés que media en este contrato es el de 12% anual, que los esposos deudores se comprometen a pagar al acreedor Don Antonio Vivaldi. Pacheco, por anualidades vencidas." El sentido de dicha cláusula está exento de dudas y su alcance no puede variarse mediante interpretaciones espurias: el deudor se comprometió únicamente a pagar intereses por el tiempo de duración del contrato de préstamo.

Tomando en cuenta lo pactado en la escritura, respecto a los intereses que el deudor venía obligado a pagarle al acreedor hipotecario, no podían recobrarse en el ejecutivo sumario intereses a razón del 12% después del vencimiento de la obligación. Sólo procedía la reclamación de los intereses legales desde la fecha en que el deudor incurrió en mora al tipo de interés de 6% anual. Así lo tiene declarado este Tribunal Supremo en reiteradas y numerosas decisiones. Véanse, entre otros, *Buil* v. *Banco Popular,* 69 D.P.R. 254 (1948); *Arvelo* v. *Román,* 65 D.P.R. 743 (1946); *Figueroa* v. *Boneta,* 58 D.P.R. 811 (1941); *Cabrera* v. *Morales,* 57 D.P.R. 457 (1940); *Caraballo* v. *Registrador,* 48 D.P.R. 923 (1935); *Goico* v. *Rodríguez,* 28 D.P.R. 530 (1920) y 30 D.P.R 606 (1922). Desde luego, el contrato de préstamo puede disponer que no sólo se pagarán intereses durante el plazo contractual del débito sino también con posterioridad al vencimiento. Por ejemplo: al convenir el tipo de interés anual sobre el capital del préstamo, los contratantes pueden expresamente disponer en la escritura de hipoteca que la suma prestada devengará dicho interés *"hasta su total reintegro"* (*Figueroa Rodríguez* v. *Ramírez,* 36 D.P.R. 917) o *"hasta que sea totalmente satisfecha"* (*Torres* v. *Fernández,* 65

114

D.P.R. 622) o *"hasta su pago definitivo"* (*F. Rodríguez Hnos. & Co.* v. *Aboy*, 66 D.P.R. 525). En todos esos casos resolvimos que el acreedor tiene perfecto derecho a cobrar en el procedimiento sumario de ejecución hipotecaria *todos* los intereses así convenidos que estén vencidos, que no hayan sido pagados y que no estén prescritos, hasta el total solvendo de la deuda, mientras no haya tercero que pueda resultar perjudicado. Arts. 114, 145 y 147 de la Ley Hipotecaria (30 L.P.R.A. sec. 210, 258 y 260). Sin embargo, en ausencia de tal convenio expreso, los únicos intereses que devenga el capital del préstamo, después de la fecha de vencimiento de la obligación, son los intereses legales al tipo de 6% anual que se cuentan desde la fecha en que el deudor incurrió en mora. Las normas jurisprudenciales expresadas aplican y desarrollan la regla estatutaria de que, ya se trate de préstamos civiles o de préstamos mercantiles, no se deberán intereses sino cuando expresamente se hubiesen pactado. Art. 1646 del Código Civil (ed. 1930), 31 L.P.R.A. 4573, y art. 232 del Código de Comercio (1932), 10 L.P.R.A. 1654.

En el caso de *Altuna* v. *Ortiz*, 12 D.P.R. 330 (1907), que fué revocado por este Tribunal implícitamente en casos posteriores, resolvimos que el acreedor podía exigir en el procedimiento hipotecario todos los intereses vencidos hasta el total solvendo de la deuda principal al tipo convenido de 9% al año, a pesar de que el deudor sólo se comprometió a devolver el capital prestado "con el interés del 9% al año, pagadero por anualidades vencidas, el día 31 de agosto de 1899". Dicha decisión se basó exclusivamente en las disposiciones de los arts. 114 y 147 de la Ley Hipotecaria:

"La hipoteca constituída a favor de un crédito que devengue interés, no asegurará con perjuicio de tercero, además del capital, sino los intereses de los dos últimos años transcurridos y la parte vencida de la anualidad corriente." (Art. 114.)

"El acreedor hipotecario podrá repetir contra los bienes hipotecados por el pago de los intereses vencidos, cualquiera que sea la época en que deba verificarse el reintegro del capital; más si

hubiere un tercero interesado en dichos bienes a quien pueda perjudicar la repetición, no podrá exceder la cantidad que por ella se reclame de la correspondiente a los réditos de los dos últimos años transcurridos y no pagados y la parte vencida de la anualidad corriente." (Art. 147.)

Sin embargo, dichos artículos de nuestra Ley Hipotecaria no establecen ninguna regla jurídica supletoria para el caso de que no exista pacto expreso relativo al pago de intereses sobre el capital de un préstamo después del vencimiento de la obligación. El único propósito de los referidos artículos es establecer en qué medida la hipoteca que garantiza el crédito capital se extiende también a los intereses que hayan sido estipulados en la escritura, con expresión del tipo convenido, *cuando los interesados no han pactado expresamente la extensión de la hipoteca a la garantía de dichos intereses.* En otras palabras, cuando los intereses convenidos en la hipoteca no se han garantizado expresamente, el art. 114 de la Ley Hipotecaria establece que por ministerio de la ley la hipoteca no sólo garantiza el capital sino que también alcanza a asegurar los intereses credituales en contra de terceros adquirentes hasta el tope máximo allí indicado. Y en virtud del art. 147, aunque las partes no hayan garantizado expresamente en la hipoteca los intereses *convenidos* sobre el crédito capital, se admite la ejecución hipotecaria para el cobro de todos los intereses así estipulados (que estén vencidos, impagados y no prescritos) mientras no se hayan otorgado actos de enajenación o gravamen de la finca hipotecada y por tanto no haya un tercero que pueda resultar perjudicado. Morell, Comentarios a la Legislación Hipotecaria, Tomo III (2a ed.) págs. 736 y siguientes; Roca Sastre, Derecho Hipotecario, Tomo IV, págs. 267 y siguientes. Véase *Torres* v. *Fernández,* supra, 628–630.[3] Pero cuando los interesados no pactan

[3] Esta es la única doctrina que establecen las Sentencias del Tribunal Supremo de España de 17 de octubre de 1932 (205 Jur. Civ. 586) y de 18 de marzo de 1946 (14 Jur. Civ. (2a s.) 160).

intereses en la escritura para después de la fecha de vencimiento, y por el contrario sólo estipulan intereses durante el término contractual, los arts. 114 y 147 de la Ley Hipotecaria no derogan las disposiciones del Código Civil y del Código de Comercio al efecto de que no se deben intereses sino cuando expresamente se hubiesen pactado.

La hipoteca es siempre accesoria del contrato de préstamo. De ahí que es imprescindible separar dos problemas: *primero*, ¿qué pactaron las partes en cuanto al pago de intereses en el contrato de préstamo?, y *segundo*, ¿de qué intereses responden los inmuebles hipotecados? La primera cuestión no depende en absoluto de la Ley Hipotecaria. Debe resolverse únicamente teniendo en cuenta la voluntad de las partes, que en materia de contratos es ley que debe cumplirse, y las disposiciones supletorias contenidas en el Código Civil y en el Código de Comercio. La segunda sí depende de lo dispuesto en los arts. 114, 145 y 147 de nuestra Ley Hipotecaria, pues se trata entonces de determinar qué intereses credituales (*acordados entre las partes*) están asegurados hipotecariamente contra el deudor hipotecante original o contra terceros adquirentes. De ahí que Morell, refiriéndose al citado art. 114 de la Ley Hipotecaria, dice lo siguiente:

"Barrachina, presenta la cuestión siguiente: 'La extensión de la hipoteca a los intereses, ¿se refiere únicamente a los devengados y no satisfechos dentro del plazo que duró el contrato de préstamo, o también a los posteriores al término de éste, intereses, que si corren, es porque el acreedor ha dejado de ejecutar los bienes, vencida la obligación asegurada?

" 'El precepto legal, dice, es terminante; no distingue entre anualidades de una y otra clase; la hipoteca las asegura todas, si no se causa perjuicio a tercero; si éste existe, ora por haber adquirido el inmueble, ora por tener sobre éste un gravamen a su favor, es cuando surge ese deslinde de responsabilidad, haciendo que la hipoteca sólo asegure los intereses correspondientes a tales anualidades; lo cual significa que en la carga hipotecaria van embebidas, en tal respecto, dos responsabilidades: una, que dice al capital del crédito; otra, a los intereses, en la limitación

de tiempo de que antes se ha hecho mérito; juicio éste que permite hacer la palabra 'asegurará', empleada en el precepto, que abarca esas dos responsabilidades, como significando la unidad de garantía del derecho del acreedor, corriendo parejas con la unidad cosa gravada con la obligación, tanto por capital, como por intereses.'

" 'No hay ley que obligue al acreedor a ejecutar, apenas venza la obligación; él ya sabe que ésta prescribe, y mientras no transcurran veinte años que dura la acción hipotecaria, usa de su derecho no reclamando; harto perjuicio sufrirá si deja transcurrir año más año sin cobrar los intereses, pues puede dar de bruces en el art. 114, si tras él tiene otros acreedores posteriores, percibiendo solamente, por tal circunstancia, y como castigo a su pasividad, intereses no mayores de los correspondientes a tres anualidades.'

*"Ahora bien; respecto a esos intereses posteriores al día del vencimiento de la obligación, habrá de estarse a lo que fuere procedente con arreglo a las estipulaciones del contrato para ese caso, pues cabe que sólo puedan exigirse intereses legales y a partir desde que legalmente pueda deducirse que incurrió en mora el deudor."* (Bastardillas nuestras.) 3 Morell, Comentarios a la Legislación Hipotecaria (2a ed., 1928) 745-746.(⁴)

Es cierto que Roca Sastre, al referirse al art. 114 de la Ley Hipotecaria, afirma que los intereses que se devenguen después del vencimiento del débito "se produce en un período de prórroga tácita del plazo contractual", aduciendo el argumento de que "si no fuese así la ley más bien impulsaría a ejercitar la acción ejecutiva, dificultando el alivio que para el deudor significa la tolerancia del acreedor a no reclamar la devolución del préstamo . . ." (Derecho Hipotecario, Tomo 4, pág. 274). Pero no encontramos justificación legal alguna

---

(⁴) Por la misma razón Morell, al comentar el art. 145 de la Ley Hipotecaria que dispone: "No se considerará asegurado con la hipoteca el interés del préstamo en la forma que prescribe el art. 114, sino cuando la estipulación y cuantía de dicho interés resulten de la inscripción misma", sólo dice que "este artículo debiera formar parte del 114, a cuyo comentario nos remitimos", pero añade—lo cual es muy significativo—: *"según el artículo 1755 del Código Civil (correspondiente al 1646 de nuestro Código Civil—ed. 1930), no se deberán intereses en los préstamos, sino cuando expresamente se hubiesen pactado".* (Bastardillas nuestras.) 4 Morell, op. cit., 225.

para la aludida teoría de que siempre existe por ministerio de ley una prórroga tácita después del vencimiento de la obligación que permite al acreedor cobrar intereses al tipo pactado por el tiempo de duración del contrato. Si no hay pacto relativo a intereses después del vencimiento del débito, lo único que cabe exigir, en adición a los devengados durante el plazo contractual, son los intereses legales desde la fecha en que el deudor incurrió en mora. Véanse los art. 1053–1061 del Código Civil de Puerto Rico (ed. 1930), 31 L.P.R.A., 3017–3025. Esta última regla, contrario a lo que expresa Roca Sastre, resulta a nuestro juicio más favorable para el deudor, puesto que de ordinario resulta en una reducción del tipo de interés. Además si el acreedor exige el pago de un interés mayor del 6%, como condición para no reclamar la devolución del préstamo, bastaría con otorgar otra escritura de hipoteca.

■■ En el caso de autos los intereses de mora comenzaron a contarse desde la fecha del vencimiento de la obligación, pues el acreedor hipotecario requirió extrajudicialmente al deudor el cumplimiento de la obligación el mismo día del vencimiento y falta de pago. Es innecesario resolver si el deudor de una obligación a plazo que consista en pago de dinero incurre en mora desde el vencimiento sin necesidad de requerimiento judicial o extrajudicial por parte del acreedor. De acuerdo con el art. 1053 del Código Civil de Puerto Rico (31 L.P.R.A. 3017), no es necesaria la intimación del acreedor para que la mora exista cuando la designación de la época en que había de entregarse la cosa fué motivo determinante para establecer la obligación. No obstante, la doctrina sostiene que, en cuanto a las obligaciones civiles a plazo, aun cuando consistan en pago de dinero, es necesario el requerimiento para que exista la mora. Véase Manresa, Código Civil Español, Tomo VII (5a ed.), pág. 124 y sigtes.; 243 y sigtes.; Scaevola, Código Civil, Tomo XIX, pág. 451 y

sigtes.; Castán, Derecho Civil Español, Tomo III, págs. 140 y sigtes. Naturalmente la intimación del acreedor no es necesaria para que la mora exista si la obligación así lo declara expresamente. Y en cuanto a las obligaciones mercantiles, la mora comienza al día siguiente del vencimiento si el contrato tiene un día señalado para el cumplimiento, por voluntad de las partes o por la ley. Art. 94 del Código de Comercio (1932), 10 L.P.R.A. 1314.(5) A menudo estas cuestiones resultan académicas, puesto que en los pagarés, contratos de préstamo e hipotecas para garantizar los mismos, las partes de ordinario estipulan expresamente los intereses que devengará el débito después del vencimiento o disponen que no será necesaria la intimación del acreedor para que exista la mora una vez incumplida la obligación.

En definitiva, pues, el acreedor hipotecario (aquí demandado apelado) reclamó en el ejecutivo sumario intereses al 12% anual después del vencimiento total de la deuda, cuando en realidad sólo podían recobrarse intereses de mora al tipo de 6%. Fuera de duda, dicha actuación vicia de nulidad el procedimiento hipotecario. En primer lugar, es preciso ajustarse de modo riguroso a los trámites y requisitos del procedimiento sumarísimo, incurriéndose en nulidad de lo actuado al apartarse de los mismos. En segundo lugar, la reclamación de intereses excesivos que no están hipotecariamente garantizados, constituye un error sustancial en perjuicio de los derechos del deudor, y consecuentemente, invalida el procedimiento ejecutivo seguido. Véanse, por ejemplo: *Buil* v. *Banco Popular*, 69 D.P.R. 254 (1948); *Torres* v. *Fernández*, 65 D.P.R. 622 (1946); *Figueroa* v. *Boneta*, 58 D.P.R. 811 (1941); y *Vázquez Vda. de McCormick* v. *Gutiérrez*, 52

(5) En *Cintrón & Aboy* v. *Solá*, 22 D.P.R. 262, 271–272 (1915), se declaró que la intimación del acreedor era innecesaria porque se había estipulado expresamente entre las partes que la cantidad adeudada devengaría intereses al 12% anual en caso de demora, señalándose además que, tratándose de un préstamo mercantil, los deudores venían obligados a satisfacer el interés pactado desde el día siguiente al del vencimiento.

D.P.R. 170 (1937).([6]) Queda aún por considerar, sin embargo, la contención del apelado al efecto de que la referida causa de nulidad no se planteó ante al tribunal a quo, por lo cual no puede suscitarse en este recurso de apelación.

██ En verdad, la cuestión del tipo de interés adeudado después del vencimiento nunca se planteó ante el tribunal sentenciador. Se alegó, en términos generales, la nulidad del ejecutivo sumario porque "se cobró más de la cantidad adeudada por capital y/o intereses . . .", pero específicamente el único fundamento aducido para sostener dicha contención fué que los demandantes hicieron un abono de $500 en 1925 de los cuales debieron acreditarse $231 a los intereses vencidos y $269 a la deuda hipotecaria, reduciéndose así el capital del préstamo a la suma de $1,831. Y, a base de la prueba ofrecida, el juez sentenciador determinó que dicho abono fué hecho en 1928 y que el mismo fué debidamente acreditado a los intereses vencidos y adeudados. No hay que olvidar, sin embargo, que en el juicio se estableció: primero, que el acuerdo entre las partes fué de pagar 12% de intereses *únicamente* durante el término del contrato; y, segundo, que el acreedor reclamó en el procedimiento hipotecario intereses al 12% anual después del vencimiento de la deuda. Ambos son hechos incuestionables que surgen de la escritura de hipo-

---

([6]) La cláusula séptima de la escritura de hipoteca disponía lo siguiente: "Para responder al pago del ameritado préstamo, *así como de sus intereses hasta la suma de doscientos cincuenta dólares*, y de las costas, gastos y honorarios de abogado, caso de reclamación judicial, hasta la suma de doscientos cincuenta dólares, los esposos Don Domingo Piovanetti y Doña Clarisa Dumont constituyen hipoteca voluntaria... etc.". Pero obviamente dicha hipoteca especial sólo se constituyó, en lo que respecta a los intereses, para limitar la garantía de éstos en perjuicio de terceros. Hemos resuelto reiteradamente que la misma no se refiere al deudor hipotecante, a menos que en forma clara y explícita se disponga lo contrario. Aún más: aquí la hipoteca se constituyó *para responder al pago del ameritado préstamo,* por lo cual es indudable que el acreedor podía cobrar hipotecariamente al deudor primitivo intereses aunque éstos excedieran de la suma de doscientos cincuenta dólares. Véanse *Gutiérrez Vda. de Crosas* v. *Longpré,* 44 D.P.R. 667, 677 (1933); *Torres* v. *Fernández,* supra, 631–634; *Arvelo* v. *Román,* 65 D.P.R. 743, 745 (1946); *Díaz* v. *Quiñones,* 68 D.P.R. 249, 258 (1948).

teca y del escrito inicial del ejecutivo sumario ofrecidos y admitidos como prueba ante el tribunal de instancia.

A nuestro juicio, la cuestión relativa al tipo de interés adeudado después del vencimiento constituye un mero *fundamento* para sostener la contención básica de los demandantes: que el procedimiento hipotecario es nulo. Los demandantes adujeron una justificación impropia de sus derechos, pero es indudable que éstos fueron debidamente reclamados ante el Tribunal Superior. Nada hay que nos impida considerar en apelación un nuevo fundamento de derecho que no fué aducido en el tribunal de instancia como base para una contención planteada en la demanda. Véanse *Marconi Wireless Co. v. United States* 320 U.S. 1, 44 (1943); Campbell, *Extent to Which Courts of Review Will Consider Questions not Properly Raised and Preserved*, 7 Wisc. L. Rev. 91, 160 (1932), 8 id. 147 (1933); 4 C. J. S., *Appeal and Error*, sec. 242. Además, aunque tal fundamento no fué alegado por los demandantes, la demanda debe ser considerada como enmendada, aun en apelación, por la prueba que se presentó sin oposición en el juicio, ya que en este caso dicha enmienda implícita no perjudica al demandado, es decir, éste tuvo amplia oportunidad de defenderse y ninguna evidencia adicional podría alterar los hechos que revelan la escritura de hipoteca y el escrito inicial del ejecutivo sumario. Véanse la Regla 15 (*b*) de las de Enjuiciamiento Civil, 32 L.P.R.A. Ap., R. 15 (*b*); *Ponce* v. *Badrena e Hijos, Inc.*, 74 D.P.R. 225, 242 (1952); *Sosa* v. *Autoridad Municipal de Hogares*, 72 D.P.R. 817, 821 (1951); *Fernández* v. *Condado Beach Hotel*, 72 D.P.R. 941, 944 (1951); 3 Moore, *Federal Practice* (2a ed.) págs. 846–848.

Por último, aún considerando la cuestión de los intereses recobrados después del vencimiento como una "cuestión nueva", no podemos aplicar en este caso la norma general de que en apelación este Tribunal "no conocerá ni resolverá ninguna cuestión que no haya sido planteada o resuelta por el

tribunal... de cuya sentencia se ha apelado." *Autoridad* *sobre Hogares* v. *Sagastivelza,* 71 D.P.R. 436, 439 (1950). Dicho principio no es ningún dogma inquebrantable sino que tiene numerosas excepciones y limitaciones. 3 Am. Jur., *Appeal and Error,* secs. 246 y sigtes.; 4 C. J. S., *Appeal and Error,* secs. 242 y sigtes. Aunque su utilidad es incuestionable en nuestro sistema procesal, es necesario aplicarlo con gran cautela, apartándose de los rigores e inflexibilidad de una regla automática. Pound, *Appellate Procedure in Civil Cases* (1941), 133–135, 298–304, 387–388; *Raising New Issues on Appeal,* 64 Harv. L. Rev. 652 (1951). Es cierto que a veces hemos expuesto la referida norma procesal con exagerada amplitud.(⁷) Pero indudablemente debemos descartar la arcaica teoría de que un apelante nunca puede variar en apelación su teoría del caso. Sólo constituye un ritualismo incompatible con la exigencia de fallar los casos en sus méritos. Cf. Moore, op. cit., supra; Clark, *Code Pleading* (1947), 263; Millar, *The Old Regime and the New in Civil Procedure,* 14 N.Y.U.L.Q. Rev. 1, 192, 201–203 (1937). Véase, sin embargo, *Latorre* v. *Cruz,* 67 D.P.R. 743 (1947). De ahí que si la cuestión planteada por primera vez en apelación no suscita ninguna controversia de hecho, y por el contrario, sólo envuelve una cuestión de derecho cuya solución basta para dictar en apelación un fallo final, no podríamos negarnos a considerarla sin faltar a nuestro deber de impartir justicia y de hallar en cada litigio la verdad.(⁸) Un

---

(⁷) Véanse *Ex parte Soto,* 71 D.P.R. 547 (1950); *Figueroa* v. *Guerra,* 69 D.P.R. 607 (1949); *F. Rodríguez Hnos. & Co.* v. *Aboy,* 66 D.P.R. 525 (1946); *Flores* v. *Silva,* 60 D.P.R. 372 (1942); *Municipio* v. *Comisión de Servicio Público,* 53 D.P.R. 276 (1938); *McCormick* v. *McCormick,* 52 D.P.R. 691 (1938); *Largé & Acevedo* v. *Fernández,* 38 D.P.R. 511 (1928).

(⁸) *Hormel* v. *Helvering,* 312 U.S. 552, 556–559 (1940); *Marconi Wireless Co.* v. *United States,* 320 U.S. 1, 44 (1943); Pound, op. cit., supra; *Raising New Issues on Appeal,* 64 Harv. L. Rev. 652 (1951). Es posible que la cuestión de derecho planteada por primera vez en apelación dependa de hechos que pudieron probarse en el juicio pero que no constan en autos porque una de las partes no levantó dicha cuestión ante el tribunal de instancia. En ese caso generalmente no podríamos considerar en apelación tal cuestión de derecho. La razón es obvia: se causaría indebido

sistema procesal ordenado es imprescindible. Pero un pleito no es un juego que deba desarrollarse dentro de un marco bien ajustado por tecnicismos. Cf. *Serra* v. *Autoridad de Transporte*, 68 D.P.R. 626, 629 (1948) y *Meléndez* v. *Iturrondo*, 71 D.P.R. 60, 64 (1950). Debemos repetirlo *ad nauseam*, aunque sólo consista en recordar lo admitido por todo el mundo, porque ningún sistema de derecho puede vivir si, a base de formalismos procesales que son innecesarios, se ahogan las posibilidades de hacer justicia sustancial.[9]

*Debe revocarse la sentencia apelada y devolverse el caso al tribunal a quo para ulteriores procedimientos consistentes con esta opinión.*

Los Jueces Asociados Sres. Marrero y Negrón Fernández no intervinieron.

___

Opinión disidente del Juez Asociado Sr. Belaval.

Se trata de la nulidad de un ejecutivo hipotecario por haberse cobrado intereses al mismo tipo pactado después del vencimiento de una obligación de préstamo, garantizada con

___

perjuicio a una de las partes al privarle de su oportunidad de defenderse mediante la presentación de evidencia adicional que hubiese podido presentar ante el tribunal de instancia para enfrentarse a la cuestión de derecho que nunca se planteó allí. Además, conviene señalar que ciertas defensas privilegiadas se renuncian al no alegarse ante el tribunal de instancia, por ejemplo: (1) la defensa de prescripción (*Peña* v. *Eastern Sugar Associates*, 75 D.P.R. 304, 324, 337 y *Fornaris* v. *Font*, 44 D.P.R. 602); (2) la defensa de *laches* en un pleito de injunction (*Rivera* v. *De Choudens*, 63 D.P.R. 995, 998). Pero la cuestión de falta de jurisdicción sobre la materia puede siempre suscitarse por primera vez en apelación, bien sea por las partes o por el tribunal *motu proprio*. Cf. *Borinquen Furniture, Inc.* v. *Tribunal*, 78 D.P.R. 901, 902–903 (1956); *West India Oil Co.* v. *Buscaglia*, 66 D.P.R. 105 (1946); *Russell & Co.* v. *Comisión de Servicio Público*, 66 D.P.R. 372 (1946). En cuanto a otras defensas adicionales, basadas en la ilegalidad de un contrato o en la inconstitucionalidad de una ley, cf. *Raising New Issues on Appeal*, 64 Harv. L. Rev. 652, 661–662 (1951).

[9] Como declaró el Juez Cardozo en *Reed* v. *Allen*, 286 U.S. 191, 209 (1932): "A system of procedure is perverted from its proper function when it multiplies impediments to justice without the warrant of clear necessity." Cf. además: L. Hand, *The Speech of Justice*, 29 Harv. L.

hipoteca. Las cláusulas de la escritura de hipoteca, referentes a los intereses, dicen así:

"CUARTO:—Los referidos esposos don Domingo Piovanetti y Doña Clarisa Dumont, se reconocen y confiesan deudores de Don Antonio Vivaldi y Pacheco, por la suma de dos mil cien dólares, que de éste han recibido en calidad de préstamo, antes de este acto y a su más entera satisfacción, otorgándole en su virtud, por ese importe, solemne carta de pago.

"QUINTO:—El pago de los dos mil cien dólares, capital de este préstamo, deberán satisfacerlos los esposos deudores, mancomunada y solidariamente al acreedor, en tres plazos, en la siguiente forma: setecientos sesenta y seis dólares, con sesenta y siete centavos, el día primero de enero del año mil novecientos veinte y seis; otros seiscientos sesenta y seis dólares, sesenta y siete centavos, en igual día y mes del año mil novecientos veinte y siete; y seiscientos sesenta y seis dólares, con sesenta y seis centavos, en el mismo día y mes de mil novecientos veinte y ocho: todos cuyos pagos se efectuarán en el establecimiento de comercio del acreedor, situado en Mayagüez, sin falta alguna.

"SEXTO:—El interés que media en este contrato es el del doce por ciento anual, que los esposos deudores se comprometen a pagar al acreedor don Antonio Vivaldi y Pacheco, por anualidades vencidas.

"SÉPTIMO:—Para responder al pago del ameritado préstamo, así como de sus intereses hasta la suma de doscientos cincuenta dólares, y de las costas, gastos y honorarios de Abogado, caso de reclamación judicial, hasta la suma de doscientos cincuenta dólares, los esposos Don Domingo Piovanetti y Doña Clarisa Dumont constituyen hipoteca voluntaria a favor de Don Antonio Vivaldi y Pacheco, sobre la finca urbana antes descrita, con todas sus actuales pertenencias y derechos anexos y con cuanto más a la misma se incorpore en adelante.

"OCTAVO:—Vencida y no pagada una anualidad de intereses, o vencido y no pagado el primer plazo de capital, se considerará vencida la hipoteca en su totalidad y con derecho el acreedor a ejecitar su cobro por la vía ejecutiva."

Rev. 617 (1916); F. Cohen, *Ethical Systems and Legal Ideals* (1933); Cahn, *The Sense of Injustice* (1949); Id., *Moral Decision: Right and Wrong in the Light of American Law* (1955); Castán, La idea de equidad y su relación con otros conceptos, morales y jurídicos, afines, 188 Rev. de Legis. y Jurisp. 217, 361 (1955); id., La Formulación Judicial del Derecho (1954).

La cuestión a determinar es la extensión de la hipoteca a los intereses pactados. Estamos ante una cuestión de Derecho hipotecario estricto. La proposición con que tenemos que enfrentarnos es que los intereses pactados en una hipoteca, sólo quedan hipotecariamente garantizados después del vencimiento de la obligación que garantiza, si las partes han pactado expresamente, que rija el mismo tipo de interés después del vencimiento de la obligación de préstamo, "hasta su total reintegro" o "hasta que sea totalmente satisfecha" o "hasta su pago definitivo"; que en ausencia de tal convenio expreso, los únicos intereses garantizados por la hipoteca después de la fecha de vencimiento de la obligación, son los intereses legales al tipo de 6% anual, a contar desde la fecha en que el deudor incurriere en mora. Creemos que la cuestión amerita un nuevo examen.

Los artículos de la Ley Hipotecaria de Puerto Rico relacionados con la garantía de intereses, son los siguientes:

El art. 147—30 L.P.R.A. sec. 260, pág. 804—dispone que: "el acreedor hipotecario podrá repetir contra los bienes hipotecados por el pago de los intereses vencidos, *cualquiera que sea la época en que deba verificarse el reintegro del capital;* más si hubiere un tercero interesado en dichos bienes a quien pueda perjudicar la repetición, no podrá exceder la cantidad que por ella se reclame de la correspondiente a los réditos de los dos últimos años transcurridos y no pagados y la parte vencida de la anualidad corriente." (Bastardillas nuestras.)

El art. 148—30 L.P.R.A. sec. 261, pág. 805—dispone que: "la parte de los intereses que el acreedor no pueda exigir por la acción real hipotecaria, podrá reclamarla del obligado por la personal, siendo considerado respecto a ella, en caso de concurso, como acreedor escriturario."

El art. 145—30 L.P.R.A. sec. 258, pág. 803—dispone que: "no se considerará asegurado con la hipoteca el interés del préstamo en la forma que prescribe la sección 210 de este

título, [art. 114] sino *cuando la estipulación y cuantía de dicho interés resulten de la inscripción misma*". (Bastardillas y corchete nuestros.)

El art. 114—30 L.P.R.A. sec. 210, pág. 782—dispone que: "la hipoteca constituída a favor de un crédito que devengue interés, no asegurará con perjuicio de tercero, además del capital, *sino los intereses de los dos últimos años transcurridos y la parte vencida de la anualidad corriente.*" (Bastardillas nuestras.)

El art. 115—30 L.P.R.A. sec. 211, pág. 785—dispone que: "al transcurrir tres años contados desde que el préstamo empezó a devengar réditos no pagados, podrá el acreedor exigir que la hipoteca constituída se amplíe sobre los mismos bienes hipotecados, con objeto de asegurar los intereses correspondientes al primero de dichos plazos, pero sólo en el caso de que habiendo vencido la obligación de pagar alguna parte de los mismos réditos hubiere el deudor dejado de satisfacerla.

"Si el acreedor hiciere uso de su derecho después de los tres años, podrá exigir la ampliación de hipoteca por toda la parte de réditos que en el momento de hacerse dicha ampliación no estuviese asegurada con la hipoteca primera; pero sin que en ningún caso pueda perjudicar la que se constituya al que anteriormente y que después de los daños haya adquirido cualquier derecho sobre los bienes hipotecados.

"Si el deudor no consintiere dicha ampliación de hipoteca, podrá el acreedor reclamarla en juicio declarativo y anotar preventivamente la demanda que con tal objeto deduzca".

El art. 116—30 L.P.R.A. sec. 212, pág. 786—dispone que: "si la finca no perteneciere al deudor, no podrá el acreedor exigir que se constituya sobre ella la ampliación de la hipoteca de que trata la sección precedente; pero podrá ejercitar igual derecho respecto a cualesquiera otros bienes inmuebles que posea el mismo deudor y pueda hipotecarlos".

Examinado en su totalidad el articulado relativo a la garantía hipotecaria por concepto de intereses, se desprende,

según Roca Sastre, *que independientemente del pacto entre las partes*, cabe distinguir tres sistemas:

(*a*) *El sistema de garantía indefinida,* en el cual, la hipoteca asegura ilimitadamente todos los intereses que devengue el crédito hipotecario, *colocando el crédito accesorio de intereses en el mismo rango que el crédito principal,* ya que constando en el Registro la cuantía del capital y el tipo de interés que produce, queda suficientemente cumplida la exigencia del principio de especialidad hipotecaria.

(*b*) *El sistema del tope máximo,* en el cual, la hipoteca únicamente se extiende *ope legis,* a garantizar determinada suma o montante de intereses, bien sea determinando cierto número de anualidades de intereses (art. 114) o en *un tanto por ciento global sobre el capital.*

(*c*) *El sistema de ampliación de hipoteca,* en el cual, la hipoteca "garantiza únicamente el capital del crédito, pero no los intereses; no obstante como a cada vencimiento de éstos surge un nuevo crédito derivado del principal, se atribuye al acreedor la facultad de exigir que se le constituya una nueva hipoteca de ampliación por todos los intereses impagados, y así sucesivamente".

Sigue Roca Sastre: en el "sistema de garantía indefinida" y en el "sistema de tope máximo", *sin necesidad de pacto alguno entre las partes, "puede decirse que los intereses están asegurados por medio de una hipoteca legal tácita",* mientras que, en el "sistema de ampliación de hipoteca", la garantía es la de una hipoteca legal expresa.

Continúa Roca Sastre: "¿Cuál de estos tres sistemas sigue nuestra legislación? Puede decirse que, al igual que muchas legislaciones latinas, sigue los tres, según los casos. Adopta, pues, un sistema misto, o mejor dicho integral. Hay que distinguir la actuación de los mismos en cada uno de los tres respectivos supuestos siguientes:

"(1) cuando después de constituída la hipoteca, *no se hayan otorgado actos de enajenación o gravamen de la finca*

*hipotecada*, rige el primer sistema, o sea que la garantía hipotecaria actúa en beneficio de todos los intereses impagados y no prescritos . . . . .

"(2) cuando, después de constituída la hipoteca, *aparece un tercer adquirente de la finca o de un derecho real sobre la misma* adopta el segundo sistema, o sea, el del tope máximo de cobertura hipotecaria por intereses impagados (art. 114) . . . . Para que esta cantidad máxima de intereses esté asegurada hipotecariamente en contra de terceros adquirentes, es preciso que figure inscrita la *estipulación* de intereses y la *cuantía* de los mismos . . .

"(3) cuando la finca hipotecada *no haya pasado a poder de un tercer poseedor*—háyanse o no constituído e inscrito con posterioridad derechos reales sobre la misma—el acreedor hipotecario puede pedir ampliación de hipoteca, o mejor dicho una nueva hipoteca por ampliación, para asegurar los intereses correspondientes". [*Vide:* IV Roca Sastre—Derecho Hipotecario 333–339, (quinta ed. de la Casa Editorial Bosch, 1954).] (Bastardillas nuestras.)

Esto es lo que la Ley establece, en ausencia de convenio entre las partes, como una hipoteca legal tácita en los dos primeros casos y como una hipoteca legal expresa en el caso de la ampliación de hipoteca.

¿Qué se entiende por una hipoteca legal tácita? En las discusiones parlamentarias sobre el proyecto de Ley Hipotecaria del 1861—que es la base de nuestra Ley actual—el diputado señor Ortiz de Zárate se expresó así: ". . . . . Esta Ley tiende sobre todo a asegurar los derechos de tercero; y como no hay necesidad de abolir por completo las hipotecas tácitas legales para asegurar los derechos de tercero creo que no se han abolido. En mi concepto, esta ley no tiene más objeto que dar tal confianza y seguridad a los terceros, que estén seguros, segurísimos, de que nadie vendrá a arrancarles las hipotecas que hallan adquirido, si se hallan inscritas en el Registro. Fuera de esto, creo que quedan las hipotecas como antes . . . . ."

El diputado señor Permanyer, contestando las objeciones del señor Ortiz de Zárate, se expresó así: ".... Recuerdo, y no sé hasta qué punto sea esto un defecto que según el Sr. Ortiz de Zárate en el proyecto de ley hipotecaria se adopta un sistema misto: no es la subsistencia de las hipotecas tácitas legales; no es la completa abolición tampoco de esas mismas hipotecas. Este me parece ser el punto de vista bajo el cual impugnaba el Sr. Ortiz de Zárate el proyecto de ley con referencia a la modificación de hipotecas.

"Pues también en esto ha tenido la desgracia de equivocarse el Sr. Ortiz de Zárate en su manera de apreciar la ley, en el modo de definir y comprender el sistema en que está basado, porque, digámoslo de una vez no hay tal sistema misto; la reforma en este punto es radical cuanto convenía que lo fuese. Subsisten las hipotecas legales, porque deben subsistir; pero desaparecen o van a desaparecer por completo las hipotecas generales, las hipotecas tácitas, los gravámenes ocultos, cuya destrucción era la principal y verdadera necesidad que había que satisfacer en la reforma ....

"Pero al recordar, Sres. Diputados, en qué consiste la novedad, la especialidad de esas condiciones a que de hoy en adelante quedarán sujetas las hipotecas legales, se descubre fácilmente que no es un sistema misto, que no es un sistema ecléctico, sino un sistema radicalmente reformador, pero prudentemente reformador, por cuanto no reforma sino lo que venía siendo un obstáculo al acrecentamiento del crédito territorial. *Subsistan enhorabuena las hipotecas legales en los casos para los que se hallaban antes establecidas, con tal que esas hipotecas no puedan perjudicar a tercero, sin estar revestidas de la conveniente publicidad;* con tal que no continúen existiendo con las condiciones de gravámenes ocultos a la investigación de los que van a adquirir bienes inmuebles, todo queda perfectamente satisfecho, y a esa clandestinidad y únicamente a ella, afecta la reforma que estamos discutiendo, pero la afecta para estirparla radicalmente" .... [Vide:

Telesforo Gómez Rodríguez, *Observaciones a la Ley Hipoteca-ria y Discusión Parlamentaria o Colección de los Discursos Pronunciados en el Senado y Congreso de los Diputados al discutirse esta Ley* (ed. de la Imprenta de la Revista de Legislación, a cargo de Julián Morales de 1861, cita precisa a las págs. 187 y 216 a 217).

En el Compendio de Legislación Hipotecaria de Aragonés se definen las hipotecas legales tácitas como "aquellas que por ministerio de la ley gravan los inmuebles sin necesidad de ningún acto externo nacido de convenio reflejado en documento y de la subsiguiente inscripción". El propio Aragonés, al glosar las tres hipotecas tácitas que subsisten en la Ley Hipotecaria del 1861, declara como la primera de ellas, *"la que corresponde al acreedor por préstamos u obligaciones que devenguen intereses por una cuantía que no excede del importe de los dos últimos años vencidos y la anualidad corriente.* Sirvió de fundamento a la ley el principio de la extensión de la hipoteca, principio por el cual la hipoteca alcanzaba a todos los intereses devengados y no satisfechos. Al determinar la responsabilidad a que quedaban afectas las fincas, hubo de pensarse en los intereses que habían de quedar garantizados, y en vez de llevar a sus últimos límites la base y declarar que las fincas no responderían más que de las cantidades que expresamente se les asignase, y por ende que cuando se quisiera garantizar intereses, se consignase taxativamente, *se aceptó la hipoteca tácita,* declarando que, a no haber pacto en contrario, la finca respondía, además del capital que se la impusiere, de los intereses de este capital por dos años y la anualidad corriente. [Vide: 2 Aragonés—Compendio de Legislación Hipotecaria 47–48 (ed. del Establecimiento Tipográfico de Jaime Ratés, Madrid, 1911).] (Bastardillas nuestras.)

Galindo y Escosura dice que "el artículo 114 ha introducido una profunda variación en el Derecho antiguo..." (anterior al 1861). En dicho derecho "la constitución de hipoteca como accesoria al contrato de mutuo, garantizaba,

no sólo el capital, sino también todos los intereses que por pacto añadido constasen de aquél, *y no estuviesen satisfechos al realizar el crédito. Esta legislación subsiste entre el deudor y el primer acreedor, cuando no hay tercero cuyos intereses puedan perjudicarse.* Pero cuando se trata de un segundo acreedor hipotecario, el artículo 114 establece que la hipoteca sólo asegura en perjuicio de tercero, el capital, los intereses de los dos últimos años y la parte, vencida de la tercera anualidad corriente.

"Disposición es esta de cuya conveniencia y conformidad con los principios que deben regir, dudamos; porque es cosa inusitada que la acción del acreedor para pedir los intereses se vaya trasmitiendo de unas anualidades a otras, *sin intervenir en ello el consentimiento de los contratantes.* No se comprende que los derechos reales que encarnados en la cosa conservan siempre esta calidad, mientras no se realizan y vive la cosa a que afectan, se extingan, sin extinguirse ésta ni realizarse aquéllos. No se comprende que el derecho real de reclamar los intereses de los tres primeros años, por la acción hipotecaria, mude de naturaleza y se convierta en personal al cuarto, quinto o sexto año, habiendo de emplearse dos acciones distintas y variables para reclamar deudas de igual origen, procedentes del mismo contrato y fundadas en el mismo documento . . . .

"Qué benevolencia ha de tener el hipotecario con el deudor, qué moratorias ha de concederle para el pago de los réditos que no puede satisfacerle por el momento cuando si afloja un punto se expone a perder todos los que no ha realizado? Ninguna: estará con los ojos fijos en el deudor, como el buitre en su presa, y aún no habrá transcurrido el día del vencimiento cuando le requerirá y le atosigará para el pago o para la ampliación de la hipoteca que le asegure los intereses . . . .

"No es menos falta de peso la presunción *juris et de jure* que se quiere introducir de que 'el acreedor renuncia a la hipoteca en la parte relativa a los intereses anteriores a los

tres años últimos, en el hecho de no reclamarlos o de no haber exigido una ampliación de inscripción sobre los mismos bienes hipotecados'; porque si tal presunción fuera aceptable, lo mismo podría aplicarse a la hipoteca, presumiendo que *cuando transcurridos tres o cuatros años de cumplido el plazo por que se otorgó el préstamo* no se hubiese reclamado, era porque se habría satisfecho la deuda". [Vide: III Galindo y Escosura—Comentarios a la Legislación Hipotecaria—235-237 (ed. del Establecimiento Tipográfico de Antonio Marzo; 1903).] (Bastardillas nuestras.)

Como se ve, cuando Roca Sastre dice, que tanto en el sistema de garantía indefinida—Derecho Hipotecario anterior al 1861 pero conservado en la legislación posterior al 1861 cuando no medie tercero—como en el sistema del tope máximo —Derecho Hipotecario posterior al 1861 todavía en vigor en la propia España—lo que se produce es una hipoteca legal tácita, que no necesita de pacto ni de inscripción, no hace otra cosa que formular con toda exactitud lo mismo el pensamiento legislativo que la glosa correspondiente a la institución.

Ahora bien, lo que se arguye es, que sólo quedan garantizados los intereses devengados durante el plazo de la obligación—caso típico de la hipoteca ordinaria, para lo cual no hubiera sido necesario promulgar el artículo 114—y no los intereses devengados después del vencimiento—caso típico de la hipoteca legal tácita consagrada en el artículo 114—. Tal conclusión está en abierto conflicto, tanto con el contenido histórico anterior al 1861, como con el contenido legislativo posterior al 1861, de la institución hipotecaria que nos ocupa. Se presta además a consagrar indirectamente, el principio de forzosidad de la ejecución, el cual resulta contrario a todo el cuerpo de principios coordinados en la propia ley.

En este aspecto de la extensión de la garantía hipotecaria por intereses después del vencimiento, se han expresado los comentaristas, consagrando el principio de la garantía indefinida cuando no medie tercero y el principio del tope máximo cuando medie dicho tercero.

La duda en el sentido de, si la garantía hipotecaria por intereses se extiende a los posteriores al vencimiento de la obligación, ha quedado también esclarecida, lo mismo por la glosa contemporánea a la institución que por las postreras rectificaciones científicas. Oigamos a Barrachina: "¿esa extensión de la hipoteca a los intereses, se refiere únicamente a los devengados y no satisfechos dentro del plazo que duró el contrato de préstamo o también a los posteriores al término de éste, intereses que si corren es porque él ha dejado de ejecutar los bienes, vencida la obligación asegurada....? Nos pronunciamos resueltamente por la afirmativa .... tanto en un caso como en el otro, el precepto legal es terminante; no distingue entre anualidades de una y otra clase; la hipoteca las asegura todas, si no se causa perjuicio a tercero; cuando éste existe, ora por haber adquirido el inmueble, ora por tener sobre éste un gravamen a su favor, es cuando surge ese deslinde de responsabilidad, haciendo que la hipoteca sólo asegura los intereses correspondientes a tales anualidades, lo cual significa, que en la carga hipotecaria van embebidas, en tal respecto, dos responsabilidades: una, que dice el capital del crédito; otra a los intereses, en la limitación de tiempo de que antes se ha hecho mérito; juicio éste que permite hacer la palabra 'asegurará' empleada en el precepto, que abarca esas dos responsabilidades, como significando la unidad de garantía del derecho del acreedor, corriendo parejas con la unidad cosa gravada, con la obligación, tanto por capital, como por intereses.

"No hay ley que obligue al acreedor a ejecutar, apenas venza la obligación; él ya sabe que ésta prescribe, y mientras no transcurran los veinte años a partir del día en que puede ponerla en ejercicio, usa de su derecho no reclamando; harto perjuicio sufrirá si deja transcurrir año más año sin cobrar los intereses, pues puede dar de bruces con el artículo 114, si tras él tiene otros acreedores posteriores, percibiendo solamente por tal circunstancia y como castigo a su pasividad,

intereses no mayores de los correspondientes a tres anuali-dades". [Vide: 3 Barrachina—Comentarios a la Ley Hi-potecaria—86–88, (ed. del Establecimiento Tipográfico fe J. Armengot e Hijos de 1911).] (Bastardillas nuestras.)

Roca Sastre, por otro lado, refiriéndose al sistema de tope máximo, a que antes hemos aludido, afirma "creemos que los intereses credituales garantizados por ministerio de la Ley con la hipoteca, tanto pueden ser los devengados durante el plazo contractual del débito como los posteriores al venci-miento del mismo.

"La Rica, no lo entiende así, pues dice que, si no hay pacto que lo contradiga, se aseguran en perjuicio de tercero dos años, y la parte vencida de la anualidad corriente, o sea tres años, pero *siempre* que el plazo de la hipoteca sea igual o su-perior a tres años, pues si fuere menor, *no podrán asegurarse más intereses* que los del *tiempo de duración del contrato.*

"Esta opinión no puede prevalecer, porque el artículo 114 no distingue entre unos y otros, ya que se refiere a los inte-reses credituales en general y tanto lo son los que se devengan antes del vencimiento del crédito como los que se devengan des-pués, puesto que éstos se producen en un período de prórroga tácita del plazo contractual.—[Nota al calce: Esto aparte de que cabe que un préstamo hipotecario esté concertado por tiempo indefinido]—Dicho artículo 114 habla de las dos últi-mas anualidades de intereses y de la parte vencida de la .anua-lidad corriente, y por tanto, reuniendo esta condición los inte-reses debidos, no hay que discriminar si los mismos estaban dentro o fuera del plazo contractual. Si no fuese así, la ley más bien impulsaría a ejercitar la acción ejecutiva, dificul-tando el alivio que para el deudor significa la tolerancia del acreedor a no reclamar la devolución del préstamo, pertur-bando con ello el crédito territorial." (IV Roca Sastre 338, obra y edición citadas.) (Corchetes nuestros.)

El texto de Morell que parece haber causado el anterior pronunciamiento nuestro, en el sentido, que después del ven-

cimiento de la obligación, no se puede cobrar otros intereses que los intereses legales, contempla dos casos absolutamente distintos al caso ordinario: (1) el caso en el cual se ha pactado que la hipoteca no responderá de interés de clase alguna, y (2) el caso en el cual se ha pactado interés, pero no se ha expresado su cuantía. He aquí el texto de Morell, coordinado en sus partes pertinentes a la cuestión que nos ocupa:

"Combinando el artículo 114 con el 145 y el 147, resulta que si en la inscripción de hipoteca *no consta que se hayan estipulado intereses o no se expresa su cuantía* la finca hipotecada no responde en perjuicio de tercero, de intereses algunos, o sólo responde de los legales. Si consta la estipulación y su cuantía (6, 8 ó 12 por 100) rige el artículo 114...

"Barrachina, presenta la cuestión siguiente: La extensión de la hipoteca a los intereses, ¿se refiere únicamente a los devengados y no satisfechos dentro del plazo que duró el contrato de préstamo, o también a los posteriores al término de éste, intereses, que si corren, es porque el acreedor ha dejado de ejecutar los bienes, vencida la obligación asegurada?

"El precepto legal, dice, es terminante; no distingue entre anualidades de una y otra clase; la hipoteca las asegura todas, si no se causa perjuicio a tercero ... No hay ley que obligue al acreedor a ejecutar, apenas venza la obligación; él ya sabe que ésta prescribe, y mientras no transcurran veinte años que dura la acción hipotecaria, usa de su derecho no reclamando ... Ahora bien, respecto a esos intereses posteriores al día del vencimiento de la obligación, habrá de estarse a lo que fuere procedente con arreglo a las estipulaciones del contrato para ese caso, *pues cabe que sólo puedan exigirse intereses legales y a partir desde que legalmente pueda deducirse que incurrió en mora* el deudor." [Vide: 3 Morell—Comentarios a la Legislación Hipotecaria—págs. 739 a 740 y 745 a 746 (segunda ed. corregida y adicionada de la Editorial Reus (S.A.) de 1928.)] (Bastardillas nuestras.)

¿Por qué dice Morell que con respecto "a esos intereses posteriores al día del vencimiento, habrá de estarse a lo que

fuere procedente con arreglo a las estipulaciones del contrato"? La razón es muy sencilla: porque además de la hipoteca legal tácita reconocida por el art. 114, que como hemos visto, no necesita de convenio ni de la inscripción correspondiente, bastando el pacto de interés y el tipo acordado para que surta sus efectos antes o después del vencimiento,—Resolución de 10 de diciembre de 1898; III Roca Sastre y Molina Juyol Jurisprudencia Registral, 442-445 (ed. de la Casa Editorial Bosch de 1953)—pueden existir hipotecas en las cuales sólo se garantice el capital o hipotecas con intereses pactados pero sin fijar el tipo, o con tipo estatutario. Éstas suelen ser las hipotecas que garantizan una cuenta corriente o la apertura de un crédito, pero no las hipotecas donde se haya fijado un interés determinado en cuyo caso rige el art. 114.

Si no se han estipulado intereses, es natural que no rija el articulado de la Ley Hipotecaria que determina la extensión de la garantía hipotecaria por intereses. Por eso Morell al comentar el art. 145 de la Ley Hipotecaria, que es el que exige la estipulación de intereses y la cuantía de los mismos, para que exista la garantía hipotecaria por intereses, hace referencia a una institución civil análoga a la hipotecaria, a la del art. 1646 de nuestro Código Civil que dispone: no se deberán intereses en los préstamos sino cuando expresamente se hubiesen pactado. Pero no hay que atribuirle a Morell una intención de subordinar el ordenamiento hipotecario al ordenamiento civil, porque él expresamente cree en la autonomía de un Derecho hipotecario inmobiliario, lo que se conoce en Derecho hipotecario como la teoría de la substantividad I— Morell—Comentarios a la Legislación Hipotecaria—18 *et seq.*, (segunda ed. de la Editorial Reus de 1925.)

El concepto de accesoriedad o substantividad de la hipoteca no tiene nada que ver en esta cuestión. No es éste el momento oportuno de entrar en la crítica de si una hipoteca es una forma inmovilizada a la cual solo aviva la voluntad de la obligación civil—teoría de la accesoriedad—o es un ente

abstracto y desconectado del crédito en absoluto—teoría de la substantividad—. A los efectos de este estudio, basta dejar consignado que entre la hipoteca que regula el Código Civil y la hipoteca que regula la Ley Hipotecaria, no hay conflicto alguno en cuanto a la extensión de la garantía hipotecaria a los intereses, que es lo que aquí importa.

El Código Civil nuestro al igual que el Código Civil español, solo contiene "una exposición de los principios esenciales del contrato de hipoteca en cuanto a su naturaleza y efectos; por haber encomendado su desenvolvimiento y reglamentación en todo lo demás a la legislación hipotecaria que había de seguir vigente como tratado especial y complementario del Código, los autores del mismo se vieron en la necesidad de consignar de una manera expresa la subsistencia de dicha ley", afirma Manresa en su comentario al art. 1880 del Código Civil español, equivalente al art. 1779 del Código Civil puertorriqueño,—31 L.P.R.A. 510 sec. 5047—"que dispone: 'la forma *extensión* y *efectos* de la hipoteca, así como lo relativo a su constitución, modificación y extensión y a lo demás que no haya sido comprendido en este capítulo queda sometido a las prescripciones de la Ley Hipotecaria, que continúa vigente' ". Sigue Manresa: "a pesar de la claridad de sus términos no han estado todos conformes en la determinación de su sentido ni en la interpretación de su precepto, entendiendo algunos que estaban vigentes las disposiciones de dicha ley [la hipotecaria] tan sólo en cuanto no habían sido modificados por el Código, [Código Civil] pues siendo éste posterior a la misma, desde luego se deducía, a su juicio, que al regular de distinto modo el legislador los principios jurídicos relacionados con las mismas vino a derogar o dejar sin efecto todo aquello que no estuviere conforme con las prescripciones de dicho Código.

"Por el contrario, otros entendieron que subsistía íntegramente en vigor dicha ley, [hipotecaria] porque la voluntad clara y manifiesta de los autores del nuevo Cuerpo legal, [Código Civil] consignada de una manera expresa y sin limitación

alguna en el presente artículo, es que rija la ley especial en todo aquello que no esté en contradicción con lo establecido *en el capítulo especial consagrado a la hipoteca*—y como los escasos preceptos de éste [el Código Civil] *no han introducido modificación ni innovación alguna en lo legislado anteriormente, según repetidamente han declarado el Tribunal Supremo y la Dirección General* . . . . de aquí que siguieran en vigor en toda su integridad y pureza las disposiciones de dicha ley, a pesar de la publicación del nuevo Cuerpo legal, que si bien en su artículo 1976 [disposición final nuestra] derogó todas las leyes, usos y costumbres anteriores, dejó, sin embargo, a salvo aquéllas que, como la Hipotecaria, las había declarado subsistente dicho Código . . .

" . . . . Es decir que la ley Hipotecaria, en la parte relativa a la hipoteca, como contrato o como derecho real, subsiste como supletoria o complementaria del Código y en tal concepto continúa vigente en toda su pureza e integridad *porque los artículos de dicho capítulo no han reformado en nada dicha ley, sino que se han ajustado sustancialmente a sus preceptos*": 12 Manresa—Comentarios al Código Civil español —547–549 (quinta ed. del Instituto Editorial Reus de 1951). (Bastardillas y corchetes nuestros.)

Los propios comentaristas del Código Civil español, del Derecho civil español, o del Derecho civil común español, cuando se refieren a la extensión de la garantía hipotecaria por intereses, aplican el art. 114 de la Ley Hipotecaria o el principio hipotecario de la especialidad correspondiente al mismo. Veamos lo que dice Federico Puig Peña:

*"Las obligaciones accesorias del crédito.—La prestación de intereses.*—Además de asegurar la hipoteca el total importe de la deuda que ella garantiza, asegura también el cumplimiento de otras prestaciones de segundo grado, como son las referentes a los intereses y costas. Ante todo, sin embargo, procede decir que si el crédito no produce intereses de clase alguna no hay por qué plantear el problema de la extensión objetiva de la garantía hipotecaria a los mismos. Si no hay nada que garantizar, no hay por qué hablar de la extensión de la garantía. Sólo, pues,

si esta prestación accesoria se ha reflejado en el documento e inscripción constitutiva de la garantía, la protección hipotecaria se extenderá a los intereses establecidos en la cuantía y alcance consignados en los documentos. A ellos habrá, en su consecuencia, que acudir, cumpliéndose en tal respecto la voluntad de las partes, siempre [que] dicha mentada estipulación no suponga la posibilidad de cobrar intereses por un período superior a cinco años, pues que conforme al párrafo segundo del artículo 114, en ningún caso podrá pactarse que la hipoteca asegure intereses por un plazo superior al referido.

"Ahora bien: puede suceder que la *escritura de constitución de hipoteca no consigne nada respecto al alcance de los intereses que asegura.* En este caso procede distinguir según que la finca haya o no pasado a manos de un tercer poseedor. *Si la hipoteca no ha pasado a manos de un tercer poseedor,* entonces no existe, en principio, problema: *el acreedor hipotecario puede perfectamente pedir el pago de todos los intereses que se adeuden por el total del tiempo transcurrido desde el establecimiento de la garantía,* siempre que, naturalmente, no hayan prescrito los mismos con arreglo a las normas ordinarias del Derecho civil (art. 114 de la ley y Sentencia de 18 de marzo de 1946).

"En cambio *cuando la finca hipotecada ha pasado a manos de un tercer poseedor,* entonces ya la cuestión cambia, porque es necesario, 'en interés y beneficio de los terceros', establecer de modo concreto el alcance máximo de la responsabilidad de la finca en orden a la garantía establecida. Esta misma consideración movió el legislador de 1861 a establecer en beneficio de los 'terceros,' (16) el sistema del tope máximo, criterio que se ha continuado en la legislación vigente al consignar en el artículo 114 que, salvo pacto en contrario, la hipoteca constituída a favor de un crédito que devengue intereses no asegurará, con

---

(16) El concepto de tercero del art. 114, se refiere a quien, sin haber intervenido en la hipoteca, adquiere e inscribe el dominio u otro derecho real sobre la finca; pero este concepto es relativo, y alude a un momento dado, a partir del cual se cuentan hacia atrás los dos años de intereses y la parte vencida de la anualidad corriente. *El criterio más generalmente admitido remite ese momento a la iniciación del procedimiento judicial* a instancia de un acreedor hipotecario y más concretamente a la fecha de la anotación preventiva de embargo en el juicio ejecutivo o a la de la nota marginal en el especial sumario; y así será tercero quien en ese momento tenga inscrito su derecho, quedando excluídos del concepto de terceros, a los efectos de extensión de la hipoteca, a los intereses y costas, los inscribientes posteriores. (Sentencia de 12 de julio de 1941.)

perjuicio de tercero, además del capital, sino los intereses de los dos años transcurridos y la parte vencida de la anualidad corriente. ([17])

"¿Quid, por tanto, de aquellos intereses que no estén comprendidos dentro del tope máximo establecido por el artículo 114? El artículo 147 de la ley dice concretamente que la parte de intereses que el acreedor no pueda exigir por la acción real hipotecaria podrá reclamarla del obligado por la personal, siendo considerado respecto a ella, en caso de concurso, como acreedor escritürario, y salvo lo dispuesto en el artículo 140.

"Independientemente del automatismo anterior por cuya virtud se extiende *ope legis* la hipoteca a los intereses de que hemos hecho mención, la ley concede al acreedor hipotecario una nueva facultad, consistente en pedir la ampliación de la hipoteca y que, por cierto, también ha de variar según que la finca haya pasado o no a manos de un tercer poseedor. Si la finca no ha pasado a manos de un tercer poseedor, entonces la cuestión es bien sencilla: el acreedor hipotecario puede perfectamente pedir la ampliación de la hipoteca para asegurar todos aquellos intereses vencidos y no satisfechos que no estuvieren garantizados por el máximum legal que determina el artículo 114. Lo único que hay que tener en cuenta es que esta ampliación de hipoteca no puede perjudicar, lógicamente, en ningún caso los derechos reales inscritos con anterioridad a ella.

"Si la finca hipotecada, en cambio, no pertenecía ya al deudor, no podrá el acreedor, como es natural, pedir ampliación de hipoteca sobre la misma finca hipotecada, pero podrá ejercitar igual derecho respecto a cualesquiera otros inmuebles del deudor que puedan ser hipotecados (art. 15, párr. 3.º).

"Dos problemas suscita esta cuestión de la ampliación de hipoteca: uno de ellos es el referente a su conveniencia, y otro

---

([17]) *El sistema del tope máximo respecto a tercero actúa ostensiblemente en tanto no haya un pacto aumentativo autorizado conforme al mismo art. 114,* pues si media tal pacto, habrá que respetar el mismo, siempre que, como dijimos en el texto, no exceda nunca la reclamación de las cinco anualidades. Este pacto de aumento fué discutida su validez en la antigua doctrina hipotecarista patria; pero triunfó el criterio de su posibilidad siempre que se fijase con exactitud la cantidad a que se extendía la garantía hipotecaria con intereses. Una resolución ya ambigua atisbó algo sobre el particular; pero las resoluciones de 14 de febrero y 15 de marzo de 1935 reconocieron como indiscutible el derecho de los interesados a pactar que la hipoteca respondiese de los intereses de todo tiempo de duración del contrato, siempre que se determinara de modo específico, la cantidad a que alcanzaba la responsabilidad.

el concerniente al modo o manera de hacer efectiva la susodicha ampliación. En cuanto al primero, ciertamente que en la doctrina se discute sus ventajas, pues no se alcanza cómo el acreedor necesite llevar adelante todo un procedimiento para conseguir un efecto que puede muy bien lograrlo a través del juicio ejecutivo reclamando los intereses a su debido tiempo; pero, no obstante, parece que se ha mantenido en la ley por la simple posibilidad de que en algún supuesto aislado pueda ser útil.

"En cuanto al modo o manera de conseguir la hipoteca de ampliación no habrá problema si media acuerdo entre los interesados. Si acaso no existiera el mismo, habría que seguir el juicio ordinario que por la cuantía corresponda y obtener la resolución judicial, pudiendo perfectamente el acreedor obtener la anotación preventiva de la demanda." III—II Puig Peña— Tratado de Derecho Civil español—99-101, (ed. de la Editorial Revista de Derecho Privado de 1951). (Bastardillas y corchetes nuestros.) Véase además: I Demófilo de Buen—Derecho Civil Común—332; 3 Sánchez Román—Estudios de Derecho Civil— 804 (segunda ed. del Estudio Tipográfico Sucesores de Rivadeneyra de 1900) ; I Clemente de Diego—Instituciones de Derecho Civil Español—467 (ed. de la Librería General de Victoriano Suárez de 1941).

Esta glosa, sobre todo la de Puig Peña demuestra todos los *puntum saliens* de la garantía hipotecaria por intereses: (1) el pacto eliminativo o limitativo de las partes consignado en documento—concepto del "salvo pacto en contrario"—; (2) el pacto aumentativo hasta las cinco anualidades; (3) el pacto en el cual no se consigne nada respecto al alcance de los intereses que asegura—caso típico del clásico pacto romano tácito que representa el art. 114.

Como se ve, no hay diferencia alguna en cuanto a la extensión de la garantía hipotecaria por intereses entre el Derecho hipotecario y el Derecho civil.

En cuanto al "pacto en contrario" o al pacto limitativo se refiere, Roca Sastre examina esta cuestión desde dos puntos de vista: (1) "en el problema de la extensión de la hipoteca a la garantía de los intereses por *ministerio de la ley,* o sea independientemente de la voluntad de los interesados", y (2) "en el que intervenga pacto". Según el mismo Roca Sastre:

"el convenio entre los interesados puede actuar sobre la extensión de la garantía hipotecaria a los intereses en estas tres direcciones: en la de *eliminarla*, en la de *ampliarla* o *reducirla* con relación al número de anualidades determinadas por la ley y en la de *substituirla* por la fijación de una cantidad alzada". IV Roca Sastre 342—obra y edición citadas—. Por esta razón, el pacto sobre intereses debe examinarse solamente en cuanto a estos dos aspectos: (1) para determinar si hay intereses pactados y a qué tipo; (2) para determinar si hay algún pacto limitativo o aumentativo en cuanto a intereses.

Nunca existió duda sobre la facultad de las partes para eliminar, reducir o substituir por una cantidad alzada, la extensión de la garantía hipotecaria a los intereses. La duda fué sobre la facultad para *ampliarla* más allá del límite de las dos anualidades y la corriente, que como tope máximo y en beneficio de tercero, establece el art. 114. "En principio, parecía no ser lícito sobrepasar el tope legal, pues las convenciones particulares no pueden desvirtuar los altos designios legislativos de favorecer el crédito territorial. No obstante, como la razón de ser de dicho tope es evitar *sorpresas* a los posteriores adquirentes, eliminando toda imprecisión, se entendió que si el pacto fijaba con exactitud la cantidad a que se extendía la garantía hipotecaria por intereses, quedaban salvados aquellos peligros que el artículo 114 pretende evitar.

"En este sentido se produjo la Dirección general, la cual, en las resoluciones de 14 de febrero y 15 de marzo de 1935, reconoció como 'indiscutible el derecho de los interesados a pactar que la hipoteca responda de los intereses de todo el tiempo de la duración del contrato' pero debiéndose determinar específicamente la cantidad a que alcanzase tal responsabilidad.

"Podía, pues estipularse *dicha mayor garantía por intereses*, pero 'fijando la cantidad alzada que por razón de los

mismos debiera responder la finca hipotecada. De dichas resoluciones parecía desprenderse que no había necesidad de expresar esta cantidad global cuando se determinaban concretamente varias anualidades de los mismos": (IV Roca Sastre 343—obra y ed. citadas.)   (Bastardillas nuestras.)

Este pronunciamiento de la Dirección General de los Registros y del Notariado, produjo, que en la Ley Hipotecaria de 30 de diciembre de 1944, aprobada por Decreto de 8 de febrero de 1946, se enmendase el art. 114 en la siguiente forma:

*"Salvo pacto en contrario,* la hipoteca constituída a favor de un crédito que devengue, no asegurará, con perjuicio de tercero, además del capital, sino los intereses de los dos últimos años transcurridos y la parte vencida de la anualidad corriente.

*"En ningún caso podrá pactarse que la hipoteca asegure intereses por plazo superior a cinco años."*—IV Roca Sastre 343 obra y ed. citadas.   (Bastardillas nuestras.)

En esta enmienda quedaron consagradas las dos doctrinas, que tanto la jurisprudencia como la glosa, habían situado en torno al art. 114: (1) que por ministerio de la Ley y sin necesidad de pacto expreso, estarían garantizados, los intereses correspondientes a dos anualidades y la corriente, a menos que las partes hubieran pactado lo contrario para eliminar, reducir o substituir dicha garantía: (2) que, en virtud de pacto expreso, estarían garantizados los intereses más allá de las dos anualidades y la corriente, pero que nunca podrían asegurarse por tal pacto intereses por mayor cantidad que la correspondiente a los intereses de cinco años.

Como se ve, cuando en una escritura de hipoteca se consignaba de acuerdo con el articulado de la Ley Hipotecaria española anterior al 1946, que la hipoteca aseguraría los intereses por todo el término de la duración del contrato, el verdadero efecto jurídico de tal pacto era, que la hipoteca se extendería más allá del tope máximo de las dos anuali-

·dades y la corriente, siempre: (1) se determinara "específicamente la cantidad a que alcanzase tal responsabilidad"— Resoluciones de la Dirección General de 14 de febrero y 15 de marzo de 1935—(IV Roca Sastre 343—obra y ed. citadas) o (2) se expresara "la cantidad total de intereses". (3 Morell 739—obra y ed. citadas.)

Siendo el estado actual de nuestra Ley Hipotecaria igual al que prevalecía en España con anterioridad al 1946, el pacto en nuestra práctica notarial, en el sentido, que la hipoteca asegura los intereses hasta el total reintegro del préstamo o hasta que la deuda sea totalmente satisfecha o hasta el pago definitivo del préstamo, no significa otra cosa, que una garantía adicional al del tope máximo que provee el art. 114, frente a terceros, si la cantidad de dichos intereses está específicamente determinada mediante la fijación de una cantidad global, o taxativamente expresada mediante la fijación de una cantidad total de anualidades de intereses, en cuyos casos la única limitación sería la del tope prescriptivo. Con esto se entiende cumplido, tanto el principio de la especialidad como el de la publicidad.

Sin embargo, lo que se arguye es, que en ausencia de pacto expreso a tal efecto, el acreedor se queda sin derecho a los beneficios de la hipoteca legal tácita provista por el art. 114, si el incumplimiento se produce fuera del plazo de la obligación.

La garantía por concepto de intereses que establece el art. 114 no gira en torno a la fecha de la constitución de la hipoteca o a la del vencimiento de la obligación, ni a la fecha de la adquisición e inscripción del tercero, sino en torno al incumplimiento y correspondiente ejecución, que puede ser lo mismo dentro que fuera del plazo de la obligación. El momento que hay que considerar siempre es el momento de la reclamación, (Morell) o a la iniciación del procedimiento judicial (Puig Peña). Así también lo resuelve la Sentencia

del Tribunal Supremo de España de 12 de julio de 1941, 14 Repertorio de Jurisprudencia civil 270 (ed. del Instituto Editorial Reus 1948). Por eso Roca Sastre lo llama el "momento procesal", debiendo entenderse como tal, "aquel en que comienza la mora judicial, o sea desde que se devengan intereses judiciales (2)—[nota al calce atendido el art. 126] 'estos intereses respecto del tercer poseedor se cuentan desde el requerimiento de pago al mismo'—hecho ya dentro del correspondiente procedimiento judicial": 3 Morell 744–745; IV Roca Sastre 337, obras y ed. citadas. Igual criterio sostiene, el ilustrado hipotecarista cubano Dorta Duque: Manuel Dorta Duque,—Curso de Legislación Hipotecaria—128, (segunda ed. de Molina y Compañía, La Habana, Cuba 1941), siempre que los intereses de la obligación consten de la inscripción, "bien en suma alzada, *bien en tanto por ciento*, en relación con el capital y por el tiempo que acuerden". Para mayor claridad por "suma alzada" se entiende aquella cantidad determinada fijada globalmente, no sujeta a evaluación o computación circunstancial—caso típico de la substitución —según antes hemos visto.

En cuanto a la redacción del documento se refiere, si en una hipoteca se especifica que la garantía hipotecaria responderá de $1,000 de capital y sus intereses al 9%, no es preciso consignar en la escritura la cantidad hasta donde alcanza la responsabilidad para el pago de intereses (Puig Peña), ya que estando fijada dicha cantidad por el art. 114 de la Ley Hipotecaria, en el caso ordinario, y frente a tercero, no podrán hacerse efectivos más que los devengados en el término señalado en el referido art. 114. Esto fué lo que se resolvió en la Resolución de 10 de diciembre de 1898 de la Dirección General de los Registros y del Notariado—III Roca Sastre y Molina Juyol Jurisprudencia Registral 442–445, (ed. de la Casa Editorial Bosch de 1953). En la resolución referida el pacto estudiado era uno que disponía "en garantía de un préstamo de 900 pesetas y de los intereses de esta

cantidad al 6 por 100 anual". En este caso el art. 114 funciona como un pacto implícito adicional al pacto expreso, siguiendo la tradición romana.

Por otro lado, si en una hipoteca se consigna que la garantía hipotecaria responderá de $1,000 de capital y sus intereses al 9% hasta la suma de $450, en el caso ordinario, y frente a tercero, podrán hacerse efectivos todos los intereses englobados hasta la suma alzada. Esto fué lo que se resolvió en la Resolución del 14 de febrero de 1935 de la Dirección General de los Registros y del Notariado—VII Roca Sastre y Molina Juyol Jurisprudencia Registral 602–605. En la nueva resolución referida el pacto estudiado era uno que disponía: "en garantía del capital prestado y por 3000 pesetas más para asegurar los intereses no garantizados por la Ley" .... En este caso el art. 114 queda enervado por el pacto expreso de las partes por encima del tope máximo. Véase también la Sentencia del Tribunal Supremo de España de 12 de julio 1941; 14 Repertorio de Jurisprudencia Civil 270, (ed. del Instituto Editorial Reus de 1948).

Podemos ahora resumir, que cuando en una escritura de hipoteca en la cual se pacta capital e interés a determinado tipo o en suma alzada, no existe pacto limitativo de las partes eliminando, reduciendo o substituyendo la garantía hipotecaria por intereses, si la finca hipotecada continúa siendo propiedad del deudor y no hay gravámenes posteriores, rige el principio de la garantía ilimitada, sin otro tope que la prescripción de la acción hipotecaria a los veinte años, sin que se necesite pacto expreso alguno a tal efecto.

Si la finca hipotecada ha pasado a poder de otra persona o hay acreedores posteriores, la hipoteca en la cual se pacta capital e interés a determinado tipo, la garantía hipotecaria por intereses queda reducida a dos anualidades completas y a aquella parte de la anualidad que corresponda al año de la ejecución, a contar desde la fecha del requerimiento al deudor dentro del procedimiento sumario; si en la hipoteca se pacta

capital e interés hasta determinada suma alzada, la garantía hipotecaria por intereses se extiende hasta la cantidad determinada.

En la ejecución del crédito hipotecario, desde la fecha de la notificación del requerimiento de pago al deudor si se ha seguido el procedimiento ejecutivo sumario, ya que el mismo equivale a una sentencia anticipada, o desde la fecha de la sentencia si se ha seguido el procedimiento ejecutivo ordinario, y hasta la fecha del remate de la finca, los acreedores ejecutantes no tienen derecho a otro interés que no sea el interés legal al 6% que es la tasa provista por el estatuto para el interés judicial.

En la opinión separada que rendimos en el caso de *Valcourt* v. *Iglesias*, 78 D. P. R. 630, 631 (1955) cita precisa página 644, concluímos que "como cuestión práctica, la única mora que se concibe dentro del procedimiento ejecutivo es la mora judicial, o sea aquella que se produce después de interpuesto el recurso", estudiando un préstamo con interés a un tipo estipulado, en la cual la finca hipotecada estaba todavía en poder del deudor. Ahora ampliamos dicho concepto, en el sentido, que también puede darse la mora en el caso de la hipoteca donde no se han pactado intereses, después de la correspondiente interpelación al deudor.

En el caso ahora bajo estudio, se trata de un préstamo por $2,100, pagadero en tres plazos anuales, que devengará intereses al doce por ciento anual, y la hipoteca que se constituye es "para responder al pago del ameritado préstamo, así como de sus intereses hasta la suma de doscientos dólares, y de las costas, gastos y honorarios de abogado, caso de reclamación judicial hasta la suma de doscientos cincuenta dólares". La finca era propiedad del deudor al momento de la ejecución y no hay nada que indique interés de tercero. Siendo ello así hemos debido aplicar el principio de la garantía indefinida y declarar válido el procedimiento sumario. Disiento.